The next case is No. 2010-1513, Tyco Healthcare Group and Mallinckrodt against Mutual Pharmaceutical Company and United Research Laboratories. Mr. Rake. Thank you, Your Honor. May it please the court. This court should reverse the summary judgment of obviousness from the District Court of New Jersey. Obviousness, according to KSR, requires predictability, some reasonable likelihood of success. Based on the prior arc here, as a whole, and I repeat, as a whole, the person of ordinary skill would not have predicted that a 7.5 milligram hard capsule temazepam product would have been effective to treat insomnia. That is, to both increase the total amount of sleep time and decrease the time it takes to fall asleep, so-called sleep latency. Does it have to be both, or is one of the two a form of utility that would be sufficient? I submit that on this record, the patent itself says that efficacy was approved and shown in both. Well, it happens that that was what their evidence showed. But certainly, there's nothing in the claims that requires that. Not literally. Not literally. Not expressly, actually. As far as I can tell. I mean, you certainly wouldn't argue that a 7.5 milligram tablet capsule that only affected sleep latency, but not length of sleep, didn't infringe, right? That's a separate question I haven't thought of. Well, but give it some quick thought, because it seems to me very obvious what the answer is. Of course you'd say it infringed. Likely. Yeah. Likely. All right. So, Bob, go ahead. Not only does the patent, in the context of the patents, say define efficacy in terms of both properties. The prior art, the Nicholson references, they tested what they called the, quote, effect of the doses that they tested. And what did they measure to test that effect? They tested both total sleep time and sleep latency. So not only does the patent say it, the prior art directly suggests to a person of ordinary skill that when one is talking about efficacy in a sleep medicine, they were talking about both properties. Getting back to the prior art, we submit that the prior art suggested that hard capsule doses below 15 milligrams were ineffective because they didn't address and do both of those things. Before we get to that evidence, let me say one quick word about burdens, the burdens that are at work here. Under the Liberty Lobby Supreme Court case, on summary, judgment of court must view the evidence through the prism of the burdens assigned by the particular substantive law, because obviousness requires proof of facts by clear and convincing evidence. The question here is whether the record facts clearly and convincingly warrant a judgment of obviousness without a trial. I submit that that is not the case here. If we look at all of the prior art, and the secondary consideration evidence as well, I submit that one cannot reasonably conclude that a clear and convincing case of obviousness has been made out. Let me ask you a question. Your claims are, again, just in terms of the size of the dosage, I believe, the 6.8 and 7.5. Not in terms of efficacy. They're not also in terms of a regimen of treatment, right? They're product claims. They're product claims. So if I were to get permission from the FDA to distribute 7.5 milligram tablets of this drug, but only for use three times a day, not for use fewer than three times a day, that would infringe your patent, right? I believe so, because the claim doesn't require any particular regimen. Well, why then do the references, the European and Indian reference, the Italian and Indian references, why do they not anticipate these claims by virtue of their reference to equivalent amounts of this drug used two and three times a day? Well, first of all, those references tested the product during the day, as opposed to taking it at night, and they never tested it at night. Nothing in these claims says anything about day or night. But the claims include the properties of the product, which is that it works and it's effective to treat insomnia. That's part of the invention as a whole. So you would say that in order to establish infringement, you have to show that these claims actually have to bring in evidence that these particular tablets, these alleged infringing tablets, do actually work? Well, making a 7.5 milligram tablet would be an infringement of the claim. Of course. And the question is, why doesn't the prior art that refers to? First of all, they don't teach 7.5 milligram tablets specifically. So it's not an anticipation. I think they have 5 and 10. They had 5 and 10. Right, so they bracket. They have 5 and they have 10. You're not suggesting that there's something magical happens at 7.5 that doesn't occur at 5 or 10, right? No, I am suggesting that. You mean you think that there is a quality here with respect to this drug that suddenly peaks in effectiveness at 7.5 but is low at 5 and low at 10? The prior art says that. The references, the Matajek reference, says 5 milligrams is of, quote, no clinical importance. That is, it doesn't work as a sleeping pill. The Nicholson references say that a 10 milligram soft capsule has no effect on total sleep time in a certain amount. Obviously, but it does have an effect on sleep latency. In the one group of patients tested in the first Nicholson reference of a certain age, in the other Nicholson reference where they were testing the drug in older patients, it not only decreased total sleep time, but it increased sleep latency. Exactly the opposite of what a sleeping pill should do. So when you take that reference, the combined Nicholson references teachings, you look at the Matajek teaching, which says to a person of ordinary skill, 5 milligrams doesn't work. Don't even bother trying it. It's of no clinical importance. That's why, and also because the references you allude to, Judge Bryson, did not, first of all, they don't concern 7.5, and neither of them say that either 5 or 10 works to treat either of those components of efficacy. But doesn't the British reference speak to a range of 5 to 15, which would be usable for geriatrics purposes, for sleeping purposes? I can see that the disclosure says 5-15 milligrams in elderly. It's a range. Well, it says 5-15, but think about that for a second. What was available in Europe was a 5 and a 10, and there was 15 available in the United States. So while it has 5-15, a person of ordinary skill in the art would know that it cannot refer to 7.5 specifically, refer to 5 arguably, perhaps a 10, perhaps a 15. But when the person looks at all of the art, as he must do, this person of ordinary skill, he knows from the other art that 5 doesn't work, and that 20 is preferred over 10 by the Nicholson references. So he stands back and says, what does all of this prior art mean to me? What is it telling me? What is it teaching me to do? And moreover, you have the BNF reference, the British reference, in its preface, tells the person of ordinary skill, warns him, you've got to look at specialized publications. We're only a pocketbook, easy, quick reference. You've got to go look at the specialized publication to determine prescribing information. That, coupled with the direct teaching away of the other references, disparaging 5, disparaging 10, and having a clear preference for soft capsules of 20 and higher, I would submit, doesn't direct a person to try or give a reasonable likelihood of success to 7.5. It does exactly the opposite. It teaches away from using or trying 7.5 and thinking it would work. Mr. Rankin, you objected to the grant of summary judgment. Would you quickly summarize for us your position with respect to the underlying facts for the conclusion of obviousness? Yes, the, in some. What was found that was adversely, that was. What the district court found. Yes, that on your theory might come out differently if it were held at trial. The district court looked at the British reference, the BNF reference, and reached its own conclusion of how that should be interpreted by a person of ordinary skill. If the judge said, I find it's incomprehensible to me that an expert would say it doesn't mean what it seems to say on its face. Well, our expert tried to explain why it doesn't mean what it appears to mean on its face. The judge excluded the evidence because he felt it was not helpful. Only then was the judge able to conclude on reaching his own determination what that reference meant to him. That was improper on summary judgment. And that's the second issue in the case. Should it, at a minimum, be remanded and have a trial so that the court properly can consider all the evidence, including our properly submitted expert evidence. The court also never got to our arguments of unexpected results. The court improperly, in our view, considered the issue of commercial success by conceding that there was sales and commercial success, but erroneously attributing the sales to the availability in the prior of low-dose products. Well, there was no 7 and 1 half milligram available in the prior art. And we had evidence from our medical doctor saying that the reasons doctors prescribed the 7 and 1 half milligram is because of the clinical benefits that gives to the patients. Using that framework, the judge found that it would have been obvious. And the judge disregarded the second prong of our efficacy argument. Namely, he said he focused on the sleep latency, the time it says to fall asleep, disregarded our expert's evidence with respect to the total sleep time and what the art taught about that, and based on that, found that the claims would have been obvious. What do you say about the evidence that Dr. Hillary Lee of the FDA, back in 1984, said that in Great Britain, Tamazepam doses from 5 to 15 are recommended for geriatrics? That is, at best, no worse or no better than what the BNF reference says. However, there was no evidence about her qualifications or whether and how a person of ordinary skill would have interpreted that information. I would say, however, that if you step back and look at all, again, all of the prior art, I repeat that you would not come to the conclusion that you have a, quote, range. You have 5, maybe. You have 10. You have 15. Let me come back to this range thing, because you're making what I think is a new argument here that I haven't seen in your brief. And I want to make sure that you and I are on the same page, and I'm understanding the argument that I think you may be making, but maybe you're not. Are you suggesting that, chemically, there is evidence here that at 7.5, there is a peak of efficacy that is not present at either 5 or 10 milligrams, assuming the same capsule in each case? Not precisely. What I am arguing, and what the record reflects, and there is data on the face of the patent to demonstrate that at 7.5, the data indicates statistically significant better results with both total sleep time and sleep latency. And there's no reason to think that wouldn't be equally or more true at, say, 10, correct? Yes, there is, Your Honor. The Nicholson references say 10 only gets you half the story. You need to get 20 to get both results. But that's an entirely different test on an entirely different group of people. You didn't have evidence, so far as I can see, at least that's in the record, that suggests that efficacy goes down with respect to your group of people. Correct. There was no comparison. So there's no basis for saying there's a peak at 7.5. I'm not arguing there's a peak. OK, well, I wanted to make sure I understood that, because when I asked you before, maybe you didn't understand my question. I may not have been clear. But I understood you to be saying that you had discovered, as we do have in some instances in the chemical arts, a particular range of efficacy that's within a general range of much lower efficacy. But that's not this case, as you're arguing it, and I understand it. My case is as follows. Dr. Sterling, the inventor, discovered that 7.5 milligrams was efficacious to treat transient insomnia, a form of insomnia. It both increased total sleep time and decreased sleep latency. He found that that was surprising. Why? Because based upon what he referred to as prior results with hard capsules, he would have guessed the cutoff would have been at some other point. That's what the patent says. What I'm also arguing is that, while we didn't go with the same patients and give them the other two doses I'm talking about, the art helps fill in that missing piece of information. Why do I say that? Matajik says 5 milligrams is of no clinical importance. There's nothing in the record to dispute that. The Dickinson references, in at least a group of older patients, say 10 milligram soft capsules give exactly the opposite result of what you want. They decrease the total amount of time that persons stay asleep, and they increase the amount of time it takes to fall asleep. So when you consider those teachings in the prior art, person's going to say to himself, 5 milligram doesn't work. 10 is not preferred. You have to go to 20. 7.5, boy, that's surprising to me. That's an invention. Did you argue before the district court the difference between the hard and the soft? I believe we did. That's reflected in the reply brief, Your Honor, in the beginning part of it. That's in the reply brief. But did you argue it on summary judgment? Yes. I meant to say it's in the reply brief in this court we explain why and how we argued that to the district court. On summary judgment? Correct. OK, we'll save your rebuttal time, Mr. Rankin. Thank you. Let's hear from Mr. Lowe. Thank you, Your Honor. Thank you, Your Honor. May it please the court. Not only did the district court find that the product claims here at issue were presumptively obvious in view of references such as the BNF, which disclosed a range of 5 to 15 milligrams directly encompassing the claimed range, and therefore is presumptively obvious.  one of which, of course, is that the BNF is that the patent claims simply a half dose version of the prior art restaurant. It has the exact same temazepam. It's just a half dose version. And there was no dispute at the district court that there was a strong motivation at the time to go to lower doses, and that the modification of the restaurant product was trivial. And based on those facts, these product claims are obvious. Furthermore, the district court found that the product claims were obvious to try. There was a known problem in the art, which is hypnotics have certain side effects, and there's always a need to go to a lower dose. And there was a finite, predictable number of solutions, namely lowering the dose. This was not only demonstrated by the prior art BNF references, but also the Sardise Italian reference, which found that 5 milligrams helped Sardise was the Indian, I think. I'm sorry. Sardise was the Indian. Sinani, I think, is the Italian. Sinani was the Italian. I apologize. The reference found that 5 milligrams was, in fact, effective to treat insomnia. And then we have the undisputed fact that 5 and 10 milligram hard gelatin capsules had been sold since the 1970s in order to treat insomnia. Yeah, but that's foreign. What significance does that have, since that can't be considered as prior art? The sales aren't necessarily prior art, but certainly they can be used. The fact that these products were known can be used as evidence of reasonable expectation of success. That's an interesting sort of line. Do you have any case law that distinguishes between not allowing the sales to be used as prior art, but allowing the facts of the sales to be used as indications of obviousness? We do cite that, not only in our summary judgment briefs, but also in our briefs to this court. What case? Remind me, because I don't remember it. Maybe your colleague can find it, or if you have some. If I could come back to that. We do cite cases that say that, to the effect of. If you can't find it, I can find it, if it's. I'm sorry. It is the National Steel case, right? National Steel, thank you. Which basically says, despite the fact that certain communications were not prior art, they still could be used to evidence reasonable expectation of success. But are you relying? Is it essential to supporting this grant of summary judgment? Whether. That evidence be considered? No, not at all, Your Honor, because we have multiple prior art references, including the BNF, which is recommending to practitioners, who in this case are ordinarily skilled artisans, physicians, to use doses as low as 5 milligrams to treat insomnia, at least in certain patients, in this particular case, the elderly. So there is a range from 5 to 15. Which range, Your Honor, fully encompasses the claimed range. And under the case law of this court, that renders the product claims here presumptively obvious. Yes, it would be helpful if you would concentrate on the undisputed facts to give as clear a picture as you can of why summary judgment was proper here. The undisputed facts are these, Your Honor, that the product claims here at issue are half-dose versions of the prior art restaurant capsules using the exact same temazepam with the exact same claimed surface area, the exact same claimed particle size. And there's no dispute that there was a strong motivation in the art to go to lower doses of hypnotics at the time. This is evidenced not only by the BNF, but there was a National Institutes of Health consensus of 1984, which was asking physicians to prescribe the lowest effective dose of hypnotics, such as temazepam. That begs the question, what is the lowest effective dose? I mean, everybody understands that physicians are directed to give the lowest effective dose of any strong chemical. But the question is, what is it? What about that study? Nothing in that study suggests that anything less than 15 would be effective, right? I don't think anybody quite knows what the lowest effective dose is. Dr. Sterling testified that he didn't know whether or not 7.5 was, in fact, the lowest dose. What physicians are asked to do is to minimize side effects and balance those with the benefits of the medication. You're talking about motivation here. In other words, the push is to lower. The push is to lower as much as possible for the benefit of the patient. Was that Dr. Sterling's testimony also as to why they tried 7.5 versus 15? He said it was obvious to try 7.5, because they had to. He was the inventor of the 954 patent. He was the named inventor of the 954. And he testified 7.5 dose was obvious to try and that he was not surprised that the dose was effective. Why 7.5? Because it was obvious why we tried it. It was half to 15. That's what he said, Your Honor. It was half to 15. In fact, Sandow, Tyco's predecessor, had agreed with FDA prior to that to incorporate a 10 milligram capsule, because FDA was pushing Sandow to provide a lower effective dose. And 7.5 just fit in their product regimen better, because it was half of 15, which was half of 30. And those were the two products they were offering at the time. Just to address something that Mr. Rank raised with respect to the BNF, the argument that they made before the district court was whether the BNF made a compelling scientific case to use 5 to 15 milligrams, or whether it presented a compelling scientific case to go to doses lower than 15 milligrams. And I think the district court properly found that that's not an appropriate legal standard. The reference teaches what it teaches. And this court's recent decision in Durham v. Watson further supports that. Basically, what that case says is that a reference as prior art, for all that it discloses, and there is no requirement that a teaching in the prior art be scientifically tested, or even guarantee success before providing a reason to combine, it's sufficient that a person of skill in the art would perceive from the reference a reasonable expectation. And that was really the argument before the district court that Tyco presented, was we did not have absolute scientific certainty that 7 and 1 half milligrams would work. But that's not the law. The law is reasonable expectation. You're saying that there was no dispute as to whether this was reasonable. Is that right? Tyco made an argument that the prior art did not demonstrate a reasonable expectation of success. That's demonstrate. That's beyond dispute. I really try to understand the underlying facts from which this conclusion of law was drawn. And those facts I presented to you, I think Judge Chesler felt that they did not raise a genuine factual dispute by suggesting that the prior art as a whole taught away, or that there was no reasonable expectation of success, given the fact that you have references like the BNF recommending to physicians to go to doses lower than 15 milligrams. And that's an important thing here to recognize, is Tyco's new argument was there's no reasonable expectation that 7 and 1 half would work. But the argument for the district court was whether there was a reasonable expectation that doses below 15 milligrams would work. So this is really a new argument that Tyco is presenting for the first time on appeal. But even if the court were to entertain that argument, I would submit that the prior art does, in fact, demonstrate that there was a reasonable expectation that 7 and 1 half would work, because it is disclosing, recommending to physicians to prescribe doses between 5 and 15 milligrams. And as to the Nicholson reference, which Mr. Rank discussed, it actually showed a quote, unquote, market improvement in patients falling asleep faster, which, of course, is what a sleep. That's at 10 milligrams? That is at 10 milligrams. But, and recall, the question was whether or not the prior art taught away from going to doses lower than 15 milligrams. If I recall, Nicholson, that suggested an improvement in sleep latency, but no improvement at all in total sleep time, correct? No statistical improvement. If you take a look at table one of Nicholson, it actually shows. What was he talking about, 76 or 79? 76 in table one. It shows a increase in total sleep time. The thing is, with Nicholson, he only had six patients. It wasn't a statistically significant increase, but certainly it didn't teach away from going to doses lower than 15 milligrams. And furthermore, whether or not it showed an increase in total sleep time is legally irrelevant, because we're talking about product claims here. As Your Honor keenly observed, and as Mr. Rank conceded, you know, if our dosage, or anybody else's dosage at 7.5 treated one or the other, but not both sleep latency and total sleep time, there would still be infringement. So why would there be a different standard for the prior art than there is for infringement? It's difficult to reconcile that. And Your Honor asked a question about hard versus soft capsules. We would submit, Your Honor, that that, in fact, is a new argument. Tyco was content to argue at the district court that there was no difference between hard and soft gelatin capsules. In fact, the prior art Fucella reference, 1977 reference, says two things about that. This is appendix A586. It says there is no difference in bioavailability between hard and soft capsules. And it further goes on to state on the next page that there is no difference between an absorption and disposition of the drug, depending on whether it's a hard and soft gelatin capsule. And so we submit, Your Honor, that this is a new argument. Not only has Tyco waived the argument here on appeal by not raising it below, but it's directly contrary to its position below, and it's directly contrary to the prior art. One other thing mentioned by Mr. Rank was the Medichak reference. The district court fully credited Tyco's position that that reference taught away. Just the legal standard, however, is whether the prior art as a whole taught away. And when you consider things such as the BNF and the Sardisay references, and even the Nicholson references which showed an increase in sleep latency, it's really impossible to conclude or to ask a juror to conclude that the prior art as a whole taught away. Furthermore, a close reading of Medichak shows that its statement that five milligrams were excluded from the study because there were no clinical significance is actually wrong. Medichak did include five milligrams in its study, and it did show efficacy on brainwaves. But not with statistical significance under the Medichak study as I read it. Medichak wasn't actually testing whether people were sleeping faster. It was testing those brainwave parameters that are associated with sleep. If I recall, it's a little hard  but if I recall Medichak and Yaw, there was determination of statistical significance with respect to various brainwave determinations. And I think Medichak ascertained no statistical significance, even though there was perhaps a difference in experimental result level from placebo. But non-statistically significant were tested at the five milligram level. Isn't that right? For some brainwave activities, that's the case. For the alpha wave activities, Medichak does say that the 20, 10 and five milligram dosages did show a proportional increase in brainwave activity above placebo. I can't recall whether statistically significant but what I think an important point here is is that the district court gave full credit to Medichak teaching away from going to doses lower than 15 milligrams just on balance, which is what the law requires. Does the prior as a whole teach away? The district court found that it was just insufficient to outweigh the overwhelming amount of evidence that tended to show that not only did the prior not teach away towards lower doses, it was teaching toward lower doses. But that was not a sleep study. Medichak, well, it was testing sleep parameters but it wasn't a nighttime study where people were falling asleep and they were testing. There were alpha tests of the brainwaves. Yeah, sort of a quick and dirty pilot study of the effectiveness of some of these drugs. Outside the four corners of this case, but I've got a question that would be helpful if you could give me an answer with respect to obviousness as a whole. I mean, suppose you've got seven studies out there, six of which say that a particular drug at a particular level of concentration in a particular setting is just not efficacious. But one that says, I think it is. Does an invention, which is taken to the patent office saying, this is my invention by someone who is not the person that did the successful study, is that obvious in those circumstances? Yeah, go ahead. I'm unfortunately out of time. I think there are certain circumstances where that type of teaching way would be compelling to a decision of obviousness, but that's not really the situation we have here because the overwhelming prior art taught towards, not away from going to doses lower than 15 and the fact that we have some parenthetical statements that are actually inconsistent with the study themselves, we submit and the district court found that that was not sufficient to overcome that shock. Thank you. Okay, any more questions? No questions? Thank you, Mr. Lowe. Thank you. Mr. Rank. Thank you, Your Honor. The parenthetical statement in MATA check admittedly the statement was made in parentheses. However, our expert introduced evidence, Dr. Orr. His evidence was excluded, however. His evidence posited that a person and why a person of ordinary skill in the art would have credited that statement. You have a teaching in the prior art that five milligram doesn't work. And by the way, Dr. Orr also introduced evidence and test, not evidence by way of declarations that you have to do a sleep study to determine whether it's the only reliable way to determine whether a particular drug at a particular dosage works as a sleeping pill. The type of tests done by MATA check don't reliably tell you one way or the other. You have to do a sleep study. Unfortunately, the district court excluded that evidence. Well, you just keep saying excluded. The district, this is summary judgment. The district court said. He specifically said he excluded it. Presumably, he would exclude it if this got to trial. Therefore, looking at summary judgment, he's saying, I find that this is not helpful. We submit that he gave it absolutely no credence. Yeah, that's right. But that's it. In effect, he excluded it. But to summarize, we have prior art which says five milligrams doesn't work in the clinic. It doesn't put people to sleep or whatever effect you want to talk about. We have other references, the Nicholson references, which in at least some subjects of their tests were totally ineffective. They increased the time it takes to fall asleep and decreased the time the person stays asleep. The district court took each of these things individually and we submit didn't consider all these teachings of the prior art as a whole. And when one does that and when one considers the clear and convincing necessary burden on the part of the opponent of obviousness here, the evidence we submit entitles us to a trial, at a minimum, entitles us to a trial. The district court should not have granted summary judgment. He shouldn't have discounted, disregarded the expert, the evidence of our expert, which he apparently did, according to our reading of the district court opinion. Well, but the point is, when it's summary judgment's a legal question, we're entitled to look at the expert. You put in a bunch of evidence. The district court said, I've looked at all this evidence. I don't think there's a jury question here. That's a question of law for us to reassess and we're entitled to look at it. Absolutely. Or assess it, which would not be the case after trial if the judge had excluded Dr. Orr. You are, and it's your duty, de novo, to review the evidence in this case. And I submit that once you look at Dr. Orr's evidence and you consider what he says about the Matochek teachings, what he considers about the Nicholson references, and when you put all that through the prism of clear and convincing evidence, I submit that you're not gonna come to the conclusion that this was a clearly and facts demonstrating obviousness proved by clear and convincing evidence. There's too much evidence going the other way. The district court ignored our evidence of unexpected results. He improperly discounted the nexus part of commercial success by attributing the success to products that didn't exist in the prior art. And so, in summary, when one looks at the totality of the evidence, the totality of the prior art, I resubmit you should inexorably come to the conclusion that, on summary judgment, it was an erroneous decision. We are, at a minimum, entitled to a trial, if not, a reversal. Any more questions, Mr. Rank? Thank you, Mr. Rank. Thank you. Thank you, Mr. Lowe. The case is taken under submission.